IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Respondent/Plaintiff, | § | |
| | § | |
| | § | CRIMINAL NO. H-06-428 |
| VS. | § | CIVIL ACTION H-10-3796 |
| | § | |
| SYED MAAZ SHAH, | § | |
| | § | |
| Petitioner/Defendant. | § | |

## OPINION AND ORDER

Pending before the Court in the above referenced cause are following matters: (1) Petitioner Syed Maaz Shah's ("Shah's") § 2255 motion to vacate, set aside or correct sentence because of ineffective assistance of counsel at trial and on appeal[1] (instrument #129 and 142 in H-06-CR-428 and #1 in H-10-CV-3796); (2) United States Magistrate Judge Frances Stacy's memorandum and recommendation (#143 in H-06-CR-428) that the motion be denied; (3) Shah's statement of objections (#144, 148 in H-06-CR-428); and (4) Shah's motion to expedite determination of § 2255 petition (#149 in H-06-CR-428).

Shah filed his motion to vacate *pro se*, but subsequently obtained counsel, Mr. Robert J. Boyle, for the preparation of Shah's statement of objections (#144) and supporting memorandum to

---

[1] Shah's trial and appellate counsel was Frank Hardin Jackson.

his § 2255 motion (#148).  A *pro se* complaint is "held to less stringent standards than formal pleadings drafted by lawyers." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 521 (1972).  *Pro se* pleadings are liberally construed. *Haines*, 404 U.S. at 521.  Nevertheless *pro se* litigants must provide sufficient facts in support of their claims; "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue." *United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993).  "Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value." *Ross v. Estelle*, 694 F.2d 1009, 1011 (5th Cir. 1983); *see also U.S. v. Onwuasoanya*, 180 F.3d 261 (Table), No. 96-20877, 1999 WL 274479, *2 (5th Cir. Apr. 16, 1999).  "[A] district court does not commit error when it disposes of a habeas petitioner's claims without holding a full-fledged hearing when those claims are unmeritorious, conclusory, and wholly unsupported by the record." *Id.* at 1011 n.2; *id.*  Here, because Mr. Boyle stepped in to represent Shah in filing his memorandum in support of his motion and subsequent submissions, there is no issue of *pro se* status in pleadings.

## Standard of Review

Once a defendant has been convicted and has exhausted or

-2-

waived his right to appeal, a Court may presume that he "stands fairly and finally convicted." *United States v. Willis*, 273 F.3d 592, 595 (5th Cir. 2001).  Therefore relief under § 2255 is limited to "transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996).  Usually when raising issues of jurisdictional or constitutional magnitude for the first time on collateral review a petitioner must show both cause for his procedural default and actual prejudice resulting from the error.  *Id.*  A claim of ineffective assistance of counsel, however, satisfies the cause and prejudice standard.  *Id.*

Objections timely filed within fourteen days of entry of the United States magistrate judge's memorandum and recommendation must specifically identify the findings or recommendations for which the party seeks reconsideration.  *Byars v. Stephens*, No. 5:13-CV-189-DAE, 2014 WL 1668488, at *2 (Apr. 14, 2014), *citing Thomas v. Arn*, 474 U.S. 140, 151 (1985).  The court does not have to consider "'[frivolous, conclusive, or general objections.'"  *Id., citing Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). Findings by the magistrate judge to which the party specifically objects must be reviewed *de novo* under 28 U.S.C. § 636(b)(1)(C).  *See Wilson*, 492 U.S. at 1221.

Findings of the magistrate judge to which no specific

objections are made require the Court only to decide whether the memorandum and recommendation is clearly erroneous or contrary to law.  *Id., citing U.S. v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. 1989).  The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).

## Applicable Law

Ineffective assistance of counsel under the Sixth Amendment is a recognized basis for invalidating a conviction.  *United States v. Urias-Marrufo*, 744 F.3d 362, 365 (5th Cir. 2014).  An ineffective assistance of counsel claim under the Sixth Amendment is a mixed question of law and fact.  *Strickland v. Washington*, 466 U.S. 668, 698 (1984).  To prevail on a claim of ineffective assistance of counsel, a petitioner must show by a preponderance of the evidence that (1) counsel's performance was deficient, i.e., that counsel made errors so serious that he or she was not functioning as "counsel" guaranteed by the Sixth Amendment and fell below an objective standard of reasonableness, and (2) that the defense was prejudiced by that deficient performance, i.e., that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different and the petitioner was thus deprived of a fundamentally fair trial and reliable outcome.  *Id.* at 694; *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *U.S. v. Wines*, 691 F.3d 599, 611 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 892 (5th Cir. 2013).  The likelihood of a

different result must be substantial, not merely conceivable:
"Counsel's errors must be 'so serious as to deprive the defendant
of a fair trial, whose result is reliable.'" *Harrington v.
Richter*, 526 U.S. 86, 104 (2011), *citing Strickland*, 466 U.S. at
687.  The court may examine either prong first and if it is found
to be dispositive, it is not necessary to address the other.
*United States v. Webster*, 392 F.3d 787, 794 & n.12 (5th Cir. 2014),
*citing Buxton v. Lynaugh*, 879 F.2d 140, 142 (5th Cir. 1989).

    "Judicial scrutiny of counsel's performance must be highly
deferential," making every effort to "eliminate the distorting
effects of hindsight," and there is a strong presumption that
strategic  or  tactical  decisions  made  after  an  adequate
investigation  lie  within  the  wide  range  of  an  objectively
reasonable performance.  *Strickland*, 466 U.S. at 689.  "'A
conscious and informed decision of trial tactics and strategy
cannot be the basis for constitutionally ineffective assistance of
counsel unless it is so ill chosen that it permeates the entire
trial with obvious unfairness.'" *United States v. Holmes*, 406 F.3d
337, 360 (5th Cir. 2005), *quoting Cotton v. Cockrell*, 343 F.3d 746,
752-53 (5th Cir. 2003).  "We will not find inadequate representation
merely because, with the benefit of hindsight, we disagree with
counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698,
701 (5th Cir. 1999), *quoting Green v. Johnson*, 116 F.3d 1115, 1122
(5th Cir. 1997).

    Under the Sixth Amendment, applicable to the States under the
Fourteenth  Amendment,  convicted persons are  also  entitled  to

effective assistance of counsel on first appeal as of right.
*Cuyler v. Sullivan*, 446 U.S. 333 (1980); *Evitts v. Lucey*, 469 U.S.
387 (1985); *Douglas v. California*, 372 U.S. 353, 356-57 (1963);
*U.S. v. Merida*, 985 F.2d 198, 202 (5th Cir. 1993).[2]

In *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1993),
*cert. denied*, 467 U.S. 1220 (1984), the Fifth Circuit opined,

> Constitutionally effective assistance of counsel under
> *Strickland* is "not errorless counsel and not counsel
> judged ineffective by hindsight. . . . *Herring v.*
> *Estelle*, 491 F.2d 125, 127 (5th Cir. 1974). The
> determination of whether counsel has rendered reasonably
> effective assistance turns in each case on the totality
> of facts in the entire record. *See Washington v.*
> *Estelle*, 648 F.2d 276 (5th Cir.) *cert. denied*, 454 U.S.
> 955 . . . (1978) . . . . Thus, we must consider a
> counsel's performance in light of "the number, nature,
> and seriousness of the charges . . . the strength of the
> prosecution's case and the strength and complexity of the
> defendant's possible defenses." *Washington v. Watkins*,
> 655 F.2d 1346, 1357 (5th Cir. 1981), *cert. denied*, 456
> U.S. 949 . . . (1982).

Furthermore to establish prejudice under the second prong of
*Strickland* the petitioner must demonstrate that his counsel's
errors were so serious that they rendered the trial's result

---

[2] The Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A,
provides that an attorney must be appointed for a financially
eligible person in criminal proceedings "from his initial
appearance . . . through appeal, including ancillary matters
appropriate to the proceedings," or who "is entitled to appointment
of counsel under the sixth amendment to the Constitution," §
3006(a)(1)(H), (c). *Adelke v. United States*, 550 Fed. Appx. 237,
239 (5th Cir. 2013). Postconviction proceedings do not qualify as
"ancillary proceedings under § 3006A, and there is no
constitutional right to counsel in postconviction proceedings. *Id.*
A court may appoint counsel "for any financially eligible person
who . . . is seeking relief" under 28 U.S.C. § 2255 if it
"determines that the interests of justice so require." *Id.*, *citing*
CJA, 18 U.S.C. § 3006(A).

unreliable or the proceeding fundamentally unfair. *United States v. Bernard*, 762 F.3d 467, 471 (5th Cir. 2014), *citing Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. Jan. 5, 2000), *citing Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983), and *Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992).

### Summary of the Procedural History[3]

Shah, a native of Pakistan legally in the United States on a non-immigrant student visa, was enrolled as an engineering student at the University of Texas at Dallas when he was arrested at the age of 19 on November 28, 2006.  As described in greater detail in the Magistrate Judge's memorandum and recommendation, on April 11, 2007 in a superseding indictment (#30), Shah was charged in counts one and two with possession of a firearm by an illegal alien in violation of 8 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), and in counts three and four, with possession of a firearm by an alien admitted to the United States under a non-immigrant student visa, arising out of his alleged possession of a firearm during camping trips in January 2006 and March 2006, in violation of 8 U.S.C. § 922(g)(5)(B) and 924(a)(2).

---

[3] For a more detailed history, see Magistrate Judge's memorandum and recommendation (#143).

At trial Shah presented a defense of entrapment, arguing that an undercover law enforcement officer, "Malik Mohammed," induced him to possess and handle weapons during two camping trips and told Shah that his possession of firearms on private lands during the January 2006 trip was legal. On May 24, 2007, after evidence showed that Shah had possessed an Armalite model M-15A4 semi-automatic rifle during two combat training sessions at a camp in Willis, Texas, a jury found him guilty on counts three and four, and the government dismissed the other two counts. #84.

In accordance with the presentence report, Shah's advisory guideline sentencing range was calculated by the Probation Department as a base offense level of 14 under United States Sentencing Guideline ("U.S.S.G.") § 2K1.2, an offense level of 14, a criminal history category of I, and an advisory guideline sentencing range of 15-21 months, for a total offense level of 16. In an upward departure, adding 12 levels to the total offense level, raising it to 28, for counts three and four, the undersigned judge sentenced Shah on September 14, 2007 to a total term of imprisonment of 78 months for each of the two counts, to be served concurrently, to be followed by a three-year term of supervised release, and a special assessment of $200. #102, Minute Entry; #108 at pp. 47-50, Transcript of Sentencing Hearing.[4] Judgment was

---

[4] Regarding the Court's upward departure, the Guidelines permit an upward departure if "the defendant's criminal history category substantially underrepresents the seriousness of the

defendant's criminal history or the likelihood that the defendant
will commit other crimes."   U.S.S.G. § 4A1.3(a)(1). At Shah's
sentencing hearing the undersigned judge explained her decision to
upwardly depart as follows, #108 at pp. 47-49:

> THE COURT:   I heard all the evidence at the trial and
> which is something that those of us here did but not
> everybody in the audience or the public did.  So I think
> that it must be emphasized that my rulings and my
> sentence are based upon what I heard in the evidence and
> weighing the credibility of the witnesses as well as the
> presentence report and the Government's filings and the
> defendant's filings in objection to the report.
>
> Pursuant to 5K2.0 and under 3553(a), the statute--
> the statute, I find that an upward departure is warranted
> as the underlying conduct of the defendant was not fully
> captured under United States Sentencing Guidelines
> Section 2K2.1.
>
> Under Chapter 3, the Chapter 3 adjustment under
> 3A1.4 was not applied because I do not believe that Mr.
> Shah's crime was an enumerated defense; but had it been
> applicable, there would have been a 12-level adjustment,
> as well as a bump up in the criminal history category to
> VI.
>
> I do find that Mr. Shah's conduct was calculated to
> influence or affect the conduct of the Government by
> intimidation or coercion or to retaliate against the
> Government conduct and is a violation of 956(a)(1), which
> relates to conspiracy to murder, kidnap, or maim persons
> abroad, and 1114, which relates to killing or attempted
> killing of officers and employees of the United States.
>
> So in an effort to fashion an upward departure that
> would be appropriate and would also satisfy the
> sentencing objectives of 3553(a), I believe that it is
> appropriate for me to add 12 levels to the total offense
> level of--
>
> MR. COOK:   16.
>
> THE COURT:   --16.  I will not make any adjustments,
> obviously, to the criminal history category.  But I will
> then, adding 12 points to the 16, would give a total
> offense level of 28, with which--with a criminal history
> category of 1, gives a guideline provision range of 78 to
> 97 months.
>
> And I will say also that part of my upward departure

-9-

entered on September 26, 2007.  #106.

On direct appeal on October 31, 2008 the Fifth Circuit affirmed Shah's conviction.  #126, 127; available at *United States v. Shah*, 294 Fed. Appx. 951 (5th Cir. Oct. 6, 2008), *cert. denied*, 558 U.S. 849 (2009).  The Fifth Circuit found that (1) the consistent and corroborative testimony of three law enforcement officers that Shah voluntarily waived his *Miranda* rights after his arrest was credible and not clearly erroneous, while Shah's testimony was not credible; (2) the evidence was sufficient to support the conclusion that Shah was not entrapped into possession of a firearm but was a willing participant in the combat training sessions; and (3) this Court was aware that it had the discretion to sentence Shah below the sentencing range of the advisory guidelines, and the Court's imposition of a 78-month sentence, based solely on policy considerations, was permissible and not plain error.  *Id.*

The Supreme Court denied Shah's petition for writ of certiorari on October 5, 2009.  #128; 558 U.S. 849 (Oct. 5, 2009).

Shah signed his § 2255 motion on September 28, 2010.  It was timely logged in as mail by the Federal Correctional Facility on September 29, 2010 and postmarked October 5, 2010.  It was filed in

---

is an effort to satisfy 18 United States Code, section 3553(a)'s mandate that the Court is to consider the deterrence of future crimes not only by the defendant himself but also by other members of the public.

this Court on October 7, 2010.[5]  #129 at p. 25.

The Court has been informed by Shah's last attorney, Robert J. Boyle, that after serving his sentence, Shah was deported.

### Shah's § 2255 Motion

Shah's ineffective assistance of trial counsel claim rests on three grounds:   (1) counsel failed to object to clearly inadmissible evidence; (2) counsel failed to utilize available impeachment and/or exculpatory evidence; and (3) counsel failed to argue relevant legal issues at sentencing.  Regarding his attorney on appeal, Shah charges that appellate counsel was ineffective  in (1) failing to challenge trial counsel's ineffectiveness; (2) failing to appeal the Court's ruling that a statement by Jim Coates to Shah was inadmissible; and (3) failing to appeal the admission of evidence from Shah's computer.

### The Magistrate Judge's Memorandum and Recommendation

To Shah's contention that counsel could have and should have

---

[5]  For purposes of the Antiterrorism and Effective Death Penalty Act's ("AEDPA's") one-year statute of limitations which runs from the date on which the conviction becomes final, to stop it from running, a *pro se* inmate's habeas petition is deemed filed when delivered to prison authorities for mailing (the "mailbox rule"), even if he did not pay the required filing fee at the time. *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998).  The rule does "not apply to prisoner litigants who are represented by counsel." *Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002).  Shah did not obtain counsel for his habeas proceeding until January 7, 2011 (#136, 137), long after he filed his motion to vacate.  Thus Shah's § 2255 motion was timely and the Court also has properly relied on the memorandum subsequently filed by counsel in support of Shah's § 2255 motion in reaching its decision.

objected to clearly inadmissible evidence, failed to use available impeachment and/or exculpatory evidence, and failed to properly argue relevant legal issues at sentencing, Magistrate Judge Stacy concluded that "the record either affirmatively shows that Shah's trial counsel was not deficient or there is no evidence that the alleged errors prejudiced Shah within the meaning of *Strickland*." #142 at p. 14.

Relying on the affidavit (#135) of trial counsel, Frank Jackson, the trial record, and the pre-sentence investigation report ("PSR") (#98), Magistrate Judge Stacy found that Shah had not overcome the presumption that counsel's decisions reflected a sound trial strategy: the documents show he was well prepared for trial and performed thorough examinations of the witnesses with a clear familiarity with all of the exhibits. While he may not have objected at times that Shah argues he could or should have, the record demonstrates that he acted in a manner consistent with his sound trial strategy. In support of Shah's entrapment defense, Mr. Jackson presented evidence that Shah intended to fish, not shoot weapons, while at the camp. She noted that "[a] court should not find inadequate representation merely because, with the benefit of hindsight, the court disagrees with counsel's strategic choices. *Green v. Johnson*, 116 F.3d 115, 1122 (5th Cir. 1997)." #143 at p. 15.

Shah argued that counsel should have objected as inadmissible

the testimony of Malik Mohammed and of FBI Agent John McKinley, defining "jihad," when they were not qualified as experts able to offer testimony requiring specialized knowledge under Federal Rule of Evidence 702,[6] or, alternatively, as nonexpert witnesses, were allowed to offer opinions that were not based on their own perception in violation of Federal Rule of Evidence 701.[7]  The Government responded that many witnesses, including Shah, used

---

[6] Rule 702, "Testimony by Expert Witness, states,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

[7] Rule 701, "Opinion Testimony by Lay Witnesses," provides,

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

terms like "jihad" and "jamaat" and that counsel endeavored to show
that "jihad" had numerous meanings and that Shah did not previously
contemplate engaging in armed conflict.

Judge Stacy found that cross examination generally
demonstrated that the term "jihad" had numerous meanings,
establishing that Shah was not prejudiced by counsel's failure to
object to anyone's definition. McKinley testified that "jihad"
meant "armed conflict" (Trial Transcript, Vol. I, #115 at p. 153),
while Mohammed defined it as "fight--we wanted to fight people that
were oppressing, you know, Muslims." *Id.* at p. 191). The
Magistrate Judge noted that FBI Agent McKinley testified that he
was the case agent in a 2004 investigation (Operation 8-Traq) of
Muslim James Coates ("Coates") and two of his associates, Kobie
Williams ("Williams") and Adnan Mirza ("Mirza"), who, McKinley
testified, had stated they wanted to go overseas and engage in
"jihad" and whom McKinley, on cross examination, identified as the
source of his "armed conflict" definition at Shah's trial:
"Because their discussion containing references to jihad or
discussions about jihad were also within the context of what they
were training for. . . . . To go overseas and engage US Coalition
forces in Afghanistan in combat operation." McKinley in addition
agreed that the term had many different meanings. #115 at pp. 174-
75. But when asked further about his statement, he conceded they
did not specifically say those words, i.e., that they were going

-14-

overseas to engage in armed conflict, but that he inferred they were from the context of the tapes. *Id.* at p. 175. Magistrate Judge Stacy opined that even if one assumed that counsel could have and should have objected to McKinley's definition, Shah has not and cannot show that he was prejudiced by it. On cross examination Malik Mohammed also agreed regarding his definition that there are a lot of people in the world who are oppressing Muslims. Trial Transcript, Vo. II, #116 at p. 306. Shah defined "jihad" as meaning "striving. Literally, that is the terminology. In our religion it is used as striving for a good cause." Shah also agreed that the term had different meanings depending on the context in which it was used. Trial Transcript, Vo. IV, # 117, at p. 477. The Magistrate Judge found that given the testimony by Mohammed and McKinley on cross examination and Shah on direct examination about the multiple meanings of "jihad," Shah failed to show he was prejudiced by his counsel's failure to object.

Responding to Shah's contention that counsel was ineffective for failing to object to Malik Mohammed's testimony that Shah was not surprised that there were weapons at the camp (#115, p. 192, 200-01, 205-06), Magistrate Judge Stacy quoted his answer on cross to counsel's question on cross examination, "[I]s there anything in any of those transcripts to reflect that Maaz Shah knew that ya'all were going to be doing any shooting on Saturday, January 14?": "In the transcripts, no, but the fact that we were sitting there with

the guns right there, yes." #116 at p. 309.

Regarding Mohammed's testimony about Shah's description of his passport as a "terrorist passport" with visas of "all the places that had activity, terrorist activity" (#116, pp. 224, 225),[8] Shah argues that counsel failed to object and that the government was seeking specialized knowledge from Mohammed as a law enforcement officer involved in terrorism investigations. Judge Stacy pointed out that counsel questioned Mohammed about his statement and Mohammed agreed that given the context where everyone was laughing and having a good time, it could have been a joke and that "[i]t wasn't elicited, so I don't know how he intended it." #116 at p. 310. When Shah was given an opportunity to clarify his comment, he testified that in the context of a group of Muslim friends, it "was merely a joke. I decided to make a joke of it." #117 at pp. 483 and 484.

Magistrate Judge Stacy further stated that even if one assumed that counsel could and should have objected to Mohammed's testimony about the "terrorist passport," Shah has not shown that he was

---

[8] In a footnote, #143 at p.21 n.5, the Magistrate Judge quoted FBI Agent Snow Robertson, who interviewed Shah after his arrest, regarding Shah's alleged comment about his passport, #117 at p. 412,:

> Initially, I asked him--I said, "Have you ever said that you are a terrorist?" And initially he said no. And then I went into further details about, "Did you ever say-raise your passport up and say, "This is a passport of a terrorist while you were conducting firearms training." And he said, "yeah, maybe."

prejudiced by his failure to object on the ground that the government was trying to give more weight to Mohammed's testimony as an expert in international terrorism.

Shah claims that counsel failed to object when Mohammed inferred from remarks relating to Shah's immigration status that "he realized his residency status--that he could get in trouble in coming out there shooting." #116, at pp. 254-55. Shah claims an objection should have been made because Shah had said nothing to Mohammed about Shah's immigration status. Judge Stacy noted that the record reflects that Shah's attorney did make a timely objection to this testimony. #116 at p. 254.

Shah contended that counsel was ineffective in failing to object to Snow Robertson's testimony as highly prejudicial in that Robinson testified that Shah told Robinson that it was Shah's "obligation to train in firearms to be able to, how did he put it, to be able to essentially conduct jihad against the United States because of--because of our actions in Iraq. And it was his obligation" as a Muslim. #117 at p.411. Shah claims that his attorney should have moved to strike this improper and highly prejudicial testimony. Magistrate Judge Stacy pointed out that counsel did object on the grounds that the statement was outside the scope agreed to at the pretrial conference and that the undersigned Judge advised counsel to address the issue on cross examination. On cross examination counsel did ask questions about

-17-

the statement and received a response that the interview was
conducted on November 28, 2006, that Snow Robertson conceded that
he took no notes during the interview, and that when he wrote his
report two days later, it did not mention the statement.  #117 at
pp. 414, 416, 418.   Robertson also admitted to counsel on
questioning that nowhere in Robinson's report was the phrase "I
want to kill Americans" found, but he also testified that Shah said
"he had an obligation to conduct jihad against Americans and
coalition forces, which is kill Americans." #117 at pp. 418-19.
Counsel objected.   Judge Stacy summarized that given the fact that
counsel objected to the testimony, Shah has not shown that
counsel's performance fell below that required by *Strickland* by not
moving to strike the testimony.  Moreover counsel  questioned Shah
about his remarks to Robertson, and Shah denied having said to
Robertson that jihad meant going out and killing Americans,
including soldiers.  #117 at pp. 477, 541.  Shah also questioned
Robertson's veracity, claiming he lied about Shah's going oversees
and his duty to fight the invading American and coalition forces.
#117 at p. 520.  Magistrate Judge Stacy concluded that Shah failed
to show "he was prejudiced given the jury was ultimately charged
with assessing witness credibility," as evidenced by the trial
court's jury instructions #143 at pp. 23, 26-27, citing #81 at pp.
4-5.

        Shah also claims that counsel was ineffective in failing to

-18-

object to the evidence of highly prejudicial extremist materials
found on Shah's computer, including *inter alia* letters from
imprisoned Sheiks Nasit al Fahd and Omar  Abdel Rahman and an
article entitled "All Desiring Jihad in the lands of the Arab
Peninsula."  Shah argued that five theoretical articles and the
letters on his computer failed to prove he had a predisposition
toward acts of violence or possession of a firearm.

The Magistrate Judge also observed that Amy Trippel, an FBI
agent assigned to the Computer Analysis Response Team laboratory
testified about the contents of the hard drive and that counsel
then tried to show that many people had access to Shah's computer.
On cross examination, Agent Trippel conceded that she could not
determine when the material was generated and placed on the hard
drive, whether Shah had generated any of it, and whether Shah had
even viewed any of it.  #117 at p. 363.  The Magistrate Judge
further found that in support of Shah's claim that many people had
access to his laptop, counsel effectively cross examined Julie
Vaughn, an FBI intelligence agent, who testified that Shah had over
800,000 items on his hard drive, that Vaughn had bookmarked as
pieces of interest over 1,700 items, and that she could not
identify who placed the material on the computer.  #117 at pp. 364-
65, 367, 369, 370, 377, 380, 381.  Counsel objected to their
admissibility and their irrelevance, but was overruled.  Judge
Stacy found that counsel's cross examination corroborated Shah's

claim that many people in addition to himself had access to the computer.

In addition Shah claimed he was prejudiced by counsel's failure to object to the government's cross examination of Shah and his eighteen-year-old brother, Syed Irbuz Shah, regarding their father's immigration status. Judge Stacy pointed out that Shah's father's immigration status was initially brought up when the government questioned Jessica Guilbeau, a senior special agent with the Department of Homeland Security, Immigration and Customs Enforcement, about Shah's visa status, which was central to the charges against him. She testified that Shah's visa for entry into the United States in 2005 had been revoked because his father's visa had been revoked on national security grounds.[9]  #116 at pp. 332, 336-39.  The government asked the Shah brothers what they knew of their father's immigration status in the United States, and Shah's brother answered that he was aware of the revocation of his father's visa, that his father had tried a number of times to get back in the United States but was denied, but stated that he was unaware of any donations by his father to Hamas.  #117 at 450. Petitioner stated that he had information that his father's visa had been revoked and that his father would not be allowed to return here.  #117 at p. 506.  The magistrate judge found that because the

_____

[9] Although revoked, the revocation was not effective, and Shah would be here legally, until he departed the country.  Guilbau testimony, #116 at p. 336-38.

father's immigration status had initially been brought up earlier during the government's questioning of Agent Guilbeau and because the brothers, themselves, testified about their father, counsel was not ineffective for failing to move for a mistrial.

Shah maintains that counsel was also ineffective for failing to object to the government's question whether Shah knew that Kobie Williams had pleaded guilty to providing money to the Taliban. The magistrate judge found the government's questioning Shah about Williams was within the scope of direct examination because Shah had testified that he had met Williams doing charity work and that he was a member of a "jaamat" with Williams, Mirza, Coates, and others to provide charitable services to the community. #117 at p. 469.

Shah's counsel presented evidence at trial showing that Shah was entrapped to attend the camp and that he actually went to fish by means of the testimony of Bilal Kathrada, who testified that Shah had purchased a fishing rod and supplies at Walmart before Kathrada dropped him off at the camp in January 2006. #117, pp. 423, 425. Shah, himself, testified that he bought fishing gear and equipment, while Mohammed testified that Shah wanted to fish and had gone fishing with Coates. #116, pp. 300, 302, 306, 308, 309. Shah has objected that counsel was ineffective for failing to use impeachment and/or exculpatory evidence. Magistrate Judge Stacy found that additional evidence would have been cumulative and that

it was the jury's province to decide which testimony to believe, as they were instructed before deliberation.

Another ineffective assistance claim is that at Shah's sentencing hearing counsel failed to present evidence and use the trial transcript to rebut the finding that Shah's conduct was designed to murder persons abroad and/or kill employees of the United States. Judge Stacy found that the sentencing hearing transcript shows that counsel filed objections to the PSR and argued them, that counsel successfully argued against increasing Shah's base offense level because his alleged offenses did not fall under the enumerated offenses under U.S.S.G. § 3A1.4, the terrorist bump, and that he argued, though unsuccessfully, against the government's request for an upward departure. Moreover Shah fully participated in the hearing. #108, pp. 8-19, 26-45. The Magistrate Judge concluded that the record shows that counsel vigorously argued against a terrorist bump and an upward departure, while Shah failed to show how the transcript of the trial would have made a difference to his sentence since the undersigned judge indicated that her decision was based on the evidence, the credibility of the witnesses, the PSR, and the submissions of the parties.

As for his attorney's performance on appeal, Shah contends that he should have raised the issue of his ineffective assistance in the trial court. Judge Stacy pointed out that such claims are

not generally raised on direct appeal. *United States v. Bass*, 310 F.2d 321, 325 (5th Cir. 2002)("[A] claim for ineffective assistance of counsel is properly made in a § 2255 motion because it raises an issue of constitutional magnitude and, as a general rule, cannot be raised on direct appeal."), *citing United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992).

Shah also complains that appellate counsel was ineffective in not challenging Shah's sentence, but the magistrate judge pointed out that counsel did object, and that the Fifth Circuit affirmed his sentence.   This Court further notes that record shows that appellate counsel did appeal the Fifth Circuit's decision and that the Supreme Court denied Shah's petition for writ of certiorari on October 5, 2009.   #128; 558 U.S. 849 (Oct. 5, 2009).[10]

Shah also charges that appellate counsel could have and should have challenged this Court's admission of evidence about Sheik Omar Abdur-Rahman that was discovered on his computer.   The magistrate judge noted that Shah did not suggest a legal basis on which such objection could be asserted and that conclusory allegations of ineffectiveness cannot support such a claim.

Finally Shah objects that counsel should have appealed this Court's refusal to admit a statement by Coates to Shah.   Judge Stacy pointed out that the record demonstrates that the Court

---

[10] Judge Stacy appears confused in stating that "appellate counsel appealed Shah's sentence and the Fifth Circuit affirmed his sentence."   #143 at p. 45.

allowed counsel to offer evidence in the form of the transcript of the recorded conversation and that counsel read it into the record. #117, p. 491.  She further observed that Shah failed to show that he was prejudiced by the admission of the statement.

In sum the Magistrate Judge determined that Shah failed to show that counsel's performance both at trial and on appeal amounted to ineffective assistance under prevailing norms and recommended that this Court deny his § 2255 motion in full.

### Shah's Statement of Objections (#144)

Shah objects to United States Magistrate Judge's "almost uncritical acceptance of trial counsel's assertion in his affidavit (#134) that his repeated failure to object to clearly inadmissible evidence and to present available impeachment and/or exculpatory evidence was based on trial strategy.  Shah argues that the affidavit is unsound because (1) his claim of trial strategy is conclusory and does not address any of the acts or omissions detailed in Shah's § 2255 motion, and (2) proper evidentiary objections and the presentation of the evidence set out in his petition would have been consistent with and even enhanced counsel's trial strategy to argue that Shah did not intend to possess weapons or engage in training when he went on the two camping trips, but was induced to handle a weapon by government agent Mohammed.  Any strategic reason for failing to object or present evidence was not reasonable.

-24-

Next Shah objects to improper opinion testimony by several individuals.

Shah contends that Mohammed and McKinley's interpretations of the meaning of "jihad," "in the context of this case" or "with this group of men," as referring to armed combat (Trial Transcript )"TT") at pp. 153, 191) were improper lay opinion evidence since they were not "helpful" to the jury, but were simply argument. Moreover because McKinley never interacted with Shah or any of the men heard in recorded conversations, McKinley's testimony was inadmissible because it was not based upon personal perception. Federal Rule of Evidence 602 states, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[11] *See United States v. John*, 597 F.3d 263, 278 (5th Cir. 2010), *citing Texas A&M Research Foundation v. Magna Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003)("'Under [Fed. R. Evid.] 701, 'a lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the [fact finder].' 'In particular the witness must have personalized

---

[11] This Court observes that the current version of Rule 602 amended in 2011 with stylistic changes only, states,

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness' own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

knowledge of the facts underlying the opinion and must have a rational connection to those facts.'").

Regarding Shah's comment to others in one of the recorded conversations during the January 2006 camping trip that due to his extensive travel his was a "terrorist passport, (TT at p. 224)" Shah objects that Mohammed was permitted to testify without objection that the countries listed in that passport were "all places that has had [*sic*] activity, terrorist activity" (TT at p. 225). He argues that Magistrate Judge Stacy's finding of no prejudice because counsel elicited that Petitioner was laughing and therefore not serious when he made the comment did not make Mohammed's testimony admissible. Mohammed was permitted to opine, without any stated basis in fact, that Shah traveled to countries that engage in terror or harbor terrorists. *See United States v. Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)(a witness's "specialized knowledge" must be determined before he/she may offer an expert opinion). Because a critical issue at trial was whether Shah had a predisposition to handle weapons, this "expert" testimony had a prejudicial effect on the jury.

In one of the recorded conversations, Shah stated that Ayub Badat expressed concern about Shah's participation in the camping trip. Counsel objected to that statement on hearsay grounds. Shah further stated that he was "on immigrant visa and things can get revoked easily for any small, whatever you want to call it . . . ."

Government 16A, pp. 254-55.   Without objection from counsel,
Mohammed testified that Shah meant that "he could get in trouble
coming out there shooting."   TT at pp. 254-55.  Magistrate Judge
Stacy found that counsel committed no error because he did object.
Shah distinguishes the fact that while Mohammed objected to the
hearsay, he did not object to Mohammed's opinion that Shah was
referring to target practice when he stated that he could get in
trouble, which Shah characterizes as an improper use of expert
testimony.

Shah lodges other failures by counsel to object.  He notes
that Magistrate Judge Stacy determined that Shah was not prejudiced
by the admission of several inflammatory articles and other items
found on his computer because counsel demonstrated that others may
have had access to that laptop.   Shah argues that counsel's
attempted minimization of the impact of these matters does not
obviate the fact that they should not have been admitted since
there was no evidence that Shah read those materials or agreed with
the thoughts and opinions in them.  Any limited probative value was
far outweighed by prejudice to Shah.  Fed. R. Evid. 403.

Shah testified on direct examination that he met  Kobie
Williams while doing charity work.  On cross examination, without
objection from counsel, the government elicited that Williams had
pleaded guilty to providing money to the Taliban.  TT at p. 511.
Shah asserts that Magistrate Judge Frances Stacy erroneously found

there was no error because the testimony was relevant.  Shah contends that Williams' guilty plea is not relevant to the issue whether Shah had a predisposition to possess weapons and that Williams' character was not at issue at Shah's trial.  Criminal defendants "are entitled to have questions of guilt based on evidence against them, not on whether a government witness or codefendant has pled guilty to the same charge." *United States v. Delgado*, 401 F.3d 290, 299 (5th Cir. 2005); *see also United States v. Harrell*, 436 F.2d 606 (5th Cir. 1970)(finding plain error where the court did not give a limiting instruction concerning codefendant's guilty plea).  Moreover the prejudice from admission of this testimony was compounded because Williams pled guilty to far more serious charges, i.e., material aid to a terrorist organization.  No limiting instruction was given because counsel did not object.  Thus the jury could use Williams' material support conviction as evidence against Shah.

Again because of the prejudice, counsel should have objected to the questioning of Shah's brother about their father being denied entry into this country because he made donations to Hamas. Shah objects that Magistrate Judge Stacy's conclusion that because Shah and his brother mentioned their father in testimony, this highly prejudicial evidence was admissible.  Even if their father did make such a donation, it was not a "bad act" of either Shah or his brother and has no relevance to the issue of whether Shah was

predisposed to handle a weapon in 2006.

Shah contends that the Magistrate Judge erred in concluding that because trial counsel obtained testimony from Mohammed that Shah had stated that he wanted to fish, counsel's failure to use additional recorded conversations discussing fishing was not ineffective. Instead, argues Shah, at trial Mohamed denied that Shah brought fishing equipment on the trip, thereby implying he had a predisposition to possess weapons. TT at p. 311. The transcripts attached to Shah's memorandum (#142) show that Shah did bring fishing equipment with him and that Mohammed knew that he did. Memorandum, Appendix, p. 4. Because the issue of Mohammed's credibility is central to Shah's entrapment defense, use of contemporaneous conversations would have bolstered his fishing defense.

### Court's Decision

As a threshold matter, the Court finds that those parts of the magistrate judge's memorandum and recommendation not challenged by Shah are not clearly erroneous or contrary to law. Therefore the Court addresses *de novo* the objections lodged by Petitioner.

As a threshold matter this Court would emphasize that the Supreme Court opined in *Strickland*, 466 U.S. at 689,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or

omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Shah first objects to Magistrate Judge Stacy's "uncritical acceptance" as "trial strategy" of trial counsel's affidavit conclusorily stating that his failure to object to "clearly inadmissible evidence' and his failure to present available impeachment and/or exculpatory evidence were based on trial strategy.  The Court observes that Shah disregards the "strong presumption" that the challenged conduct of trial counsel "was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992)(*citing Strickland*), *cert. denied*, 509 U.S. 921 (1993).  Shah also fails to mention that trial counsel explains in his affidavit that it was based on his memory because he did not have access to the trial transcript in making it since after the appeal of Shah's conviction, "Shah demanded that the record be forwarded to him in its entirety." #135.  More importantly here, however, this Court would emphasize that Magistrate Judge Stacy expressly stated that she also relied on the

trial record and the PSR and proves it by citing to specific portions of the record throughout her analysis of counsel's effectiveness and trial strategy. As noted, "'[t]he determination of whether counsel has rendered reasonably effective assistance turns in each case on the totality of facts in the entire record. . . . Thus, we must consider a counsel's performance in light of "the number, nature, and seriousness of the charges . . . the strength the prosecution's case and the strength and complexity of the defendant's possible defenses.'" *Baldwin v. Maggio*, 704 F.2d at 1329, *citing Washington v. Estelle*, 648 F.2d 276 *, and Washington v. Watkins*, 655 F.2d at 1357.[12] Given the specificity of Magistrate Judge Stacy's examination and references to the record, the Court overrules Shah's objection.

Next, Shah contends counsel failed to object to McKinley's and Mohammed's definitions of "jihad," as improper lay opinion.

In *United States v. Akins*, 746 F.3d 590, 599 (5th Cir. 2014), *cert. denied*, 135 S.Ct. 707 (2014), the Fifth Circuit recognized that in the context of drug conspiracies, the traffickers' jargon was

> "a specialized body of knowledge, familiar only in those wise in the ways of the drug trade, and therefore a fit subject for expert testimony." But we have not limited drug slang testimony to experts in all cases. Rather, we

---

[12] *See also Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003)("A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.").

have recognized that testimony about the meaning of drug code words can be within the proper ambit of a lay witness with extensive involvement in the underlying investigation. In *United States v. Miranda*, [248 F.3d 434 (5th Cir. 2001),] the appellant maintained that an FBI agent, who had not been designated as an expert witness, testified about the meanings of various code words heard on intercepted phone calls and thereby "crossed the line" from lay to expert testimony. In rejecting that argument under the facts presented there, we held that the agent's testimony was permissible under Fed. R. Evid. 701 because the agent's extensive participation in the investigation of this conspiracy, including surveillance . . . and the monitoring and translating of intercepted telephone conversations allowed him to form opinions concerning the meaning of certain code words used in this drug ring based on his personal perceptions. Similarly, in *United States v. El-Mezain*, [664 F.3d at 515] we acknowledged that some of the facts presented by testifying agents would not be known to an average lay person. But we held that the district court did not err by admitting the testimony because "the agents' opinions were limited to their personal perceptions from their investigation of this case." We noted that "[b]y explaining the meanings of terms as used in the conversations and documents, as well as the relationships between the people they were investigating, the agents provided the jury with relevant factual information about the investigation. And we clarified that "[t]estimony need not be excluded as improper lay opinion even if some specialized knowledge on the part of the agents was required, if it was based on first-hand observations in a specific investigation."

In this case, at trial (#115 at pp. 147-67), FBI Special Agent McKinley testified that he entered service with the FBI in 2004 and served with the international terrorism squad in Houston and in the investigation that became known as Operation 8-Traq, during which he performed many duties ranging from reviewing transcripts to conducting surveillance. The investigation began in early 2004 when the FBI interviewed Kobie Williams and James Coates after they

-32-

were found traveling through Big Bend National Forest with weapons because it became concerned that Williams was going to commit an act of terrorism in the United States. Coates, a Muslim, was a resident of Houston. Coates voluntarily cooperated with the FBI and provided information to it about Williams and his group. McKinley testified that the agency used confidential sources or cooperating witnesses to make recordings so it would have access to people that law enforcement would not and to obtain information that a law enforcement official could not get first hand. These recordings could allow the agents to hear for themselves what was being said among the group under investigation and not have to rely on someone else's word. Coates agreed to make such recordings and did so of numerous conversations among Williams, Adnan Mirza, Coates, and, later, Shah about their plans, training, and going overseas to conduct jihad. McKinley stated that Shah attended 40% of the training sessions. The FBI conducted airborne surveillance of the weekend shooting camps and posted agents nearby as a security team to listen over transmitters worn by Coates.

This Court concludes, using the same reasoning as the Fifth Circuit did in *Akins*, that McKinley's definitions of jihad and jamaat were of terms used in the conversations and documents among the people the FBI team was investigating, based on first-hand observations in a specific investigation, and he provided the jury with relevant factual information about the investigation.

Moreover his testimony was rationally based on his personal perception and would be helpful to the jury. *See also United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008)(a witness may testify "as a lay witness drawing from his 'past experiences formed from firsthand observation' as an investigative agent."); *United States v. El-Mezain*, 664 F.3d 467, 514 (5th Cir. 2011).

The Court overrules Shah's objections regarding McKinley's definitions.

Similarly Malik Mohammed testified that as a state law enforcement officer, he worked alongside federal agents, was certified by the FBI to operate under cover and, among other assignments, he served joint terrorism task forces.  #115 at p. 178.  In some he played the role of a Muslim male, as he did at the request of officials in Houston in Shah's case in Operation 8-Traq in 2005.  *Id.* at pp. 181-82.  He was introduced to Kobie Williams and Adnan Mirza through Jim Coates, the cooperating witness, as a weapons trainer.  He became part of the "jaamat, as we called it, which was our group, was pretty close, and I was one of the core members of it."  Initially the jaamat was composed of Williams, Mirza, Coates and Mohammed, while later Shah joined the jaamat. *Id.* at p. 186, 187-88.  Mohammed described the jaamat as composed of "like-minded" individuals:  "[b]asically the jaamat was somewhat dissatisfied with the Americans, things that were going on with the American government, in the government sense, and people that were

-34-

outspoken about such issues and believing the United States was doing something wrong . . . ." *Id.* at 188.  He further stated, "The ultimate plan was to do our training and make ourselves as military sound as possible, and we were going to go to Pakistan, which would be like a takeoff point for us to get into Afghanistan and Iraq and to eventually be able to engage some of the coalition American forces and fight on the side of the Muslims." *Id.* at 189; *see also* 190-91 (with Williams, Mirza and Shah, to Mohammed "Jihad was basically, you know, fight--we wanted to fight people that were oppressing, you know, Muslims.").  Mohammed attended three camping weekends in September 2005, January 2006, and March 2006, the latter two attended by Shah, and he was constantly in contact with Mirza and Williams.  He also recorded conversations and listened to the tapes that were made and ensured that the transcripts based on them were correct.  Thus his testimony was rationally based on his personal perception obtained from his position and experience during his investigative participation with the group and was one "that a normal person would form from those perceptions," as well as one that was helpful to the factfinders.  The Court finds that the *Akins* and *United States v. Jackson* rules and rationales would apply to Mohammed, too.

In addition Rule 701 "allows lay testimony relating to a defendant's hypothetical mental state":  "testimony regarding a witness's understanding of what the defendant meant by certain

statements is permissible lay testimony, as long as the witness's understanding is predicated on his knowledge and participation in the conversation." *United States v. Hassan*, 742 F.3d 104, 135 (4th Cir. 2014)(allowing testimony on defendant's understanding of the word "jihad")(*citing United States v. Offill*, 666 F.3d 168, 177-78 (4th Cir. 2011), and *United States v. Min*, 704 F.3d 314, 325 (4th Cir. 2013)), *cert. denied*, 135 S. Ct. 157 (2014).

Furthermore the Court agrees with Magistrate Judge Stacy that testimony from various witnesses made clear that there were many definitions of "jihad" and the jury did not have to accept any one.

Shah objects that during the January 2006 camping trip when Shah told others that his was a "terrorist" passport, Mohammed was allowed to state without objection from counsel that the countries stamped in Shah's passport were "all places that has had activity, terrorist activity."   #116 at 225.   This Court observes that Mohammed testified that Shah was the first person to bring up the passport and that he voluntarily made the statement linking his passport with terrorist activity, opening the door.   Moreover, Mohammed was asked, "As a law enforcement official doing what you do, was there anything that struck you about the countries he discussed," and he answered, "[A]s the group stated, that is all places that has had activity, terrorist activity."  *Id.* at 225. Thus Mohammed's testimony was based on personal knowledge and experience.   Moreover knowledge of which countries are targets of

terrorism in this age is not restricted to specialists in the field.

Shah complains that while his attorney lodged a hearsay objection to Ayub Badat's expression of concern about Shah's participation in the camping trip, counsel did not object to Mohammed's opinion that Shah was referring to his immigrant status and to target practice when he stated that he "could get in trouble coming out there shooting," a statement which Shah maintains is an improper use of expert testimony. In the context of Shah's own statement that he was "on immigrant visa and things can get revoked easily for any small, whatever you want to call it . . . ," and the fact that the remark was made in the context of the shooting camp group of would-be jihadists, the Court finds no prejudice in counsel's failure to object. #16, pp. 254-55. It does not take an expert in the field to reach such a conclusion.

Regarding the inflammatory articles and matter found on Shah's laptop, not only did Judge Stacy find the evidence permissible, but recognized there was evidence submitted showing others had access to Shah's computer. This Court would emphasize that while the articles might be inflammatory, they corroborated other evidence presented at trial of Shah's interest in and participation in activity with the goal of involvement in jihad.

Shah objects that after Shah testified that he met Williams while doing charity work, trial counsel failed to object when the

government elicited on cross examination that Williams had pleaded guilty to providing money to the Taliban.  As Judge Stacy noted, the evidence was relevant to Shah's commitment to jihad, and  Shah did open the door to such questioning.  Even if he had not, Williams was not indicted with Shah, and there was substantial independent evidence presented to the jury aside from Shah's association with Williams that Shah committed the crime for which he was convicted.  Thus the Court finds no prejudice from counsel's failure to object.

As for evidence that Shah and his brother's father was barred from re-entry into the United States and may have given money to Hamas in the past, and that Shah's status as a derivative nonimmigrant was accordingly reovoked. the Court finds that, in addition to being relevant to Shah's own immigration situation, a central issue in this case, any prejudice from the testimony is not substantial based  on the totality of facts in the entire record, nor so serious to render the trial unfair or the result unreliable to warrant finding that counsel was ineffective.  *Bernard*, 762 F.3d at 471.  Shah has not shown that there is a reasonable probability that but for counsel's alleged unprofessional error, the result of the trial would have been different.  *Strickland*, 466 U.S. at 694.

Last of all, Shah asserts that he went on the camping trips to fish and that counsel failed to present additional recorded conversations to bolster this defense.  Shah argues that although

-38-

Mohammed denied that Shah had brought fishing equipment with him,
implying that Shah had a predisposition to possess weapons, the
transcripts which counsel attached to Shah's memorandum showed that
Shah did bring such equipment with him and that Mohammed knew it.
First the Court would point out that Mohammed testified that "*to
[his] knowledge* . . . the only person who had any fishing gear was
Mr. Coates," and he agreed with the questioning attorney that
Williams did not bring fishing gear.   #116 at p. 218 (emphasis
added by the Court).  *See also id.* at p. 322-23.   The Court notes
that there was testimony supporting Shah's contention that he
brought fishing equipment by his friend, Bilal Kathrada, but
Kathrada's testimony was swiftly impeached.  *See* #117, p. 425-26,
429-32.  As far as any fishing that Saturday morning (January 14,
2006) was concerned, Mohammed stated, "It would have been less than
an hour, a little less than that.  We basically got up at sunrise
to pray, and we had just a little time to get ready, get breakfast
started, things like that, so that we could go out for our training
for that morning," which was "the focus of the day." *Id*.  Moreover
there is substantial evidence, including photographs, that Shah had
possession of and carried a weapon in the camp and participated in
the shooting, whether or not he also came expecting to fish.
Evidence demonstrated that during the training exercise he wore
camouflage, boots and military fatigues and carried a gun, again
supported by photographs.  #116 at p. 227.

In sum, the Court finds that Shah fails to show that his counsel was ineffective at trial or on appeal.  Shah fails to demonstrate that counsel committed such serious errors that his performance fell below the objective standard of reasonableness in light of the totality of the circumstances here or that there was a reasonable probability that the result of the proceedings would have been different had counsel acted as Shah unpersuasively argues he should have.

For the reasons cited above, the Court, for the reasons stated above, hereby ADOPTS Magistrate Judge Stacy's memorandum and recommendation as its own and

ORDERS that Shah's objections are OVERRULED.  The Court further

ORDERS that Shah's § 2255 motion is DENIED.

Shah's motion to expedite (#149) is MOOT.

### Certificate of Appealability

Finally, under 28 U.S.C. § 2255(c)(1)(B), "Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a proceeding under section 2255." *See also* Federal Rule of Appellate procedure 22(b)(1)("If an applicant files a notice of appeal, the district judge who rendered the judgment must either issue a certificate of appealability or state why a certificate should not issue.").  Furthermore, "[a] certificate of

appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issue presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), *citing Slack v. McDaniel, 529 U.S. 473, 484 (2000).*  Where the district court denies a § 2255 motion on the merits, to warrant a certificate of appealability a Movant must be able to show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Hanry v. Cockrell*, 327 F.2d 429, 431 (5th Cir. 2003).  A district court may deny a certificate of appealability *sua sponte.* *Haynes v. Quarterman*, 526 F.3d 189, 193 (th Cir. 2008), *citing Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

   **B**ecause Shah has failed to make a substantial showing of  a denial of a constitutional right, i.e., that reasonable jurists could disagree with this Court's resolution of his claims, the Court

   ORDERS that Petitioner is DENIED a certificate of

appealability.

   **SIGNED** at Houston, Texas, this  31st  day of   March  , 2015.

_____

MELINDA HARMON
UNITED STATES DISTRICT JUDGE